# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## KNOXVILLE DIVISION

| | | |
|---|---|---|
| Citizens National Bank and<br>CNB Bancshares, Inc. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Civil Action No.:** 3:20-cv-555 |
| v. | ) | |
| | ) | |
| Volunteer Bancorp, Inc. and<br>Civis Bank, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

---

## COMPLAINT
---

Plaintiffs Citizens National Bank and CNB Bancshares, Inc. ("CNB Bancshares") (collectively "Plaintiffs"), by and through counsel, file this Complaint against Defendants Volunteer Bancorp, Inc. ("Volunteer") and Civis Bank ("Civis") (collectively "Defendants").

## PARTIES, JURISDICTION, & VENUE

1.      Plaintiff Citizens National Bank is, and was at all relevant times, a national banking association with its principal place of business at 200 Forks of the River Pkwy, Sevierville, Tennessee 37862.

2.      Plaintiff CNB Bancshares, Inc. is, and at all relevant times was, a Tennessee corporation with its principal place of business at 200 Forks of the River Pkwy, Sevierville, Tennessee 37862, and is the registered bank holding company of Citizens National Bank.

3.      Upon information and belief, Defendant Volunteer Bancorp, Inc. is, and at all relevant times was, a Tennessee corporation with its principal place of business at 210 E. Main St., Rogersville, Tennessee 37857.

4.      Upon information and belief, Defendant Civis Bank is, and at all relevant times was, a Tennessee-chartered commercial banking corporation and a wholly owned subsidiary of Defendant Volunteer with its principal place of business at 210 E. Main St. Rogersville, Tennessee 37857.

5.      The Court possesses subject matter jurisdiction under the securities laws of the United States, pursuant to 15 U.S.C. § 77L and 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367, as such claims are so related to the federal claims asserted herein as to form part of the same case or controversy.

6.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

7.      Plaintiffs first began conversations with Defendant Volunteer to acquire Defendant Civis in January 2019.

8.      On May 10, 2019, Plaintiffs and Defendants first entered into an indication of interest agreement ("Original IOI") for Plaintiffs to acquire Civis.  (**Exhibit A**).

9.      Under this Original IOI, Plaintiffs provided Volunteer's Board of Directors time to authorize its agents to pursue an out-of-court settlement strategy as to material debts and obligations thereof in order to avoid bankruptcy proceedings that might otherwise be necessary given the continuing financial deterioration of Defendants.

10.     During this time, Defendant Volunteer actively discussed and sought out Plaintiffs to be the purchaser of Civis, regardless of the outcome of the decision of Volunteer's Board of Directors regarding the pursuit of an out-of-court settlement strategy as to material debts and obligations thereof.

11.     Based on Defendants' actions and discussions with Plaintiffs, Plaintiffs would either (1) purchase Civis outside of bankruptcy if Volunteer's Board of Directors authorized its agents to pursue an out-of-court settlement strategy or (2) purchase Civis through a statutory sale process under federal bankruptcy law and procedures if the pursuit of settlement was not successful.

12.     The process for Volunteer's Board of Directors to seek, pursue, and implement an out-of-court settlement strategy to avoid bankruptcy took approximately nine months and was ultimately unsuccessful.  During this time, the Original IOI was extended several times to accommodate Volunteer's out-of-court settlement process.  (**Exhibit B**).

13.     When the out-of-court settlement strategy was unsuccessful, Volunteer informed Plaintiffs that Volunteer intended to file a petition for relief and reorganization under Chapter 11 of the U.S. Bankruptcy Code in connection with which Volunteer's principal asset, i.e. Civis Bank, would be sold in a bankruptcy auction process (commonly referred to as a Section 363 sale).

14.     In contemplating this Section 363 sale, Defendants requested that Plaintiffs accommodate Defendants by taking on the role of a "stalking horse" in the anticipated bankruptcy sale process.  Defendants were aware that a "stalking horse," as the initial bidder in the bankruptcy sale process is commonly known, typically has to expend greater resources than other bidders in negotiating the deal and the definitive agreement, performing due diligence, and otherwise setting the "floor" for the terms of the sale transaction.

15.     On or around March 5 and March 6, 2020, Defendants executed a Letter of Intent ("LOI") stating that Plaintiffs would acquire Civis from Volunteer in either a stock purchase or asset purchase transaction.  (**Exhibit C**).

16.     The March 2020 LOI contemplated that, if Plaintiffs determined to acquire 100% of the capital stock of Defendant Civis from Defendant Volunteer, rather than alternatively acquiring Civis' banking assets directly from Civis, then Plaintiff CNB Bancshares would be the party acquiring 100% of the capital stock of Civis under the definitive agreement with Defendants.

17.     The parties understood that, following the consummation of any such stock purchase transaction and the regulatory approval thereof, CNB Bancshares would thereafter cause Civis Bank to be merged with and into Citizens National Bank, with Citizens National Bank being the surviving bank after such merger.

18.     The March 2020 LOI and all subsequent extensions of the LOI contained an exclusivity provision (the "Exclusivity Provision"), stating, in part, that "neither Volunteer, Civis, nor any of their respective directors, officers, or employees or representatives will solicit or participate in negotiations or discussions with any person or entity with respect to any sale of the shares or the sale of a material portion of assets or business of Civis." Additionally, the Exclusivity Provision states that in the event that a discussion with another person or entity regarding the purchase of Civis does occur, Volunteer and Civis will *immediately* notify Citizens National Bank.

19.     The Exclusivity Provision of the LOI provides that if Defendants violate the LOI, Citizens National Bank has the right to demand full payment of the $300,000 fee described in Paragraph 3 of the LOI.

20.     In accordance with the LOI, Defendant Volunteer submitted a draft definitive agreement to Plaintiffs on or around July 31, 2020 for the purchase by Plaintiff CNB Bancshares of 100% of the capital stock of Defendant Civis.

21. Following the execution of the LOI, Plaintiffs and Defendants had numerous discussions regarding the drafting of the definitive agreement between the parties, due diligence requirements, and related exhibits as to the sale process under federal bankruptcy law.

22. In anticipation that the parties would execute and deliver the definitive agreement, Plaintiffs thereafter engaged a local Knoxville bankruptcy attorney to represent Plaintiff CNB Bancshares as the "stalking horse" for the impending acquisition of Civis through the bankruptcy sale process.

23. The LOI Exclusivity Provision and due diligence provision were extended on several occasions throughout 2020. Ultimately, on November 5, 2020, the LOI Exclusivity Provision and due diligence provision were extended through November 30, 2020. (**Exhibit D**).

24. Between November 30, 2020 and December 18, 2020, Plaintiffs and Defendants had almost daily communications regarding negotiations, drafting, and finalizing the Stock Purchase Agreement between Plaintiff CNB Bancshares and Defendants. During this time, Defendants continued to request that Plaintiffs take all necessary steps to finalize negotiations between the parties and execute the Stock Purchase Agreement. Additionally, Defendants continued to expressly or impliedly represent to Plaintiffs that Civis was at imminent risk of being put into receivership by its prudential regulator if the Stock Purchase Agreement between the parties was not executed as soon as possible.

25. Between November 30, 2020 and December 18, 2020, Plaintiffs repeatedly requested that Defendants provide accurate and complete due diligence information regarding material contracts that had not been timely furnished by Defendants.

26. On December 18, 2020, Volunteer's investment banker and legal counsel both asked for Plaintiff CNB Bancshares' signature page for the fully negotiated and completed Stock

Purchase Agreement between Plaintiff CNB Bancshares and Defendants, which was provided around noon. Additional discussions also took place that afternoon between the parties regarding finalizing the Stock Purchase Agreement and its exhibits and schedules.

27.     At no point did Defendants mention any other potential purchaser or a change in Defendants' intent to sell 100% of the Civis stock to Plaintiff CNB Bancshares.

28.     That same evening, December 18, 2020, following nearly two years of negotiations and Plaintiff CNB Bancshares providing its signature page for the agreed-upon Stock Purchase Agreement, Plaintiffs were notified by Defendants' agent and investment banker, that Defendants had entered into a letter of intent with another interested entity and/or individual(s) and thus would not be entering into a Stock Purchase Agreement with Plaintiffs. Plaintiffs did not receive notice from Defendants' executive management, Board of Directors chairman, or counsel.

29.     Upon information and belief, based upon the representations of Defendants' investment banker and agent, Defendants were in discussions with another party regarding purchasing Civis prior to November 30, 2020, in violation of the Exclusivity Provision of the LOI with Plaintiffs.

30.     On December 19, 2020, Plaintiffs' counsel contacted Defendants' counsel to verify whether Defendants intended to sign the finalized Stock Purchase Agreement and whether Defendants had in fact entered into a new letter of intent with another party without Plaintiffs knowledge. Despite the urgency of the situation, Plaintiffs did not receive a response from Defendants' counsel until Plaintiffs' counsel sent a second email, two days after Plaintiffs' initial email revoking the release of Plaintiffs' signature page.

31.     To date, neither Defendants nor Defendants' counsel have provided any substantive verification of Defendants' intentions regarding the sale of Civis or Defendants' actual conduct

surrounding their letter of intent with a new party, despite repeated requests by Plaintiffs' counsel to provide this information.

32.     Defendants intentionally, or at a minimum recklessly, concealed their scheme to defraud Plaintiffs related to the purchase of Civis.

33.     Defendants had a legal duty to disclose their scheme to defraud, their course of deceitful and fraudulent business, and the true facts surrounding their intent to sell Civis to another party.

34.     Plaintiffs have suffered substantial harm as a result of the actions of Defendants. During negotiations with Defendants, Plaintiffs performed loan participations in order to keep Civis afloat and to enable Defendants to maintain customer relationships during the negotiations for Plaintiff to purchase Civis.  Defendants relied on Plaintiffs' loan participations because the loans were above Civis' legal lending limit, due to its deteriorated capital levels.  Plaintiffs' loan participations totaled nearly $500,000.

35.     Additionally, Plaintiffs have been deprived of the benefit they sought in the purchase of Defendants.   Based upon their own agent's forecasts and representations, Plaintiffs acquisition of Defendants would have resulted in profit for Plaintiffs in the amount of at least one million dollars ($1,000,000) per year at a minimum.

36.     In addition to the above, at the request of Defendants, Plaintiffs offered the Civis Chief Financial Officer ("CFO") promise of employment, regardless of the outcome of the negotiations for Plaintiffs to purchase Civis, so that the CFO would not leave Civis for other employment offers during the negotiation process with Plaintiffs.

## CAUSES OF ACTION

### COUNT I:
### VIOLATION OF 15 U.S.C. § 77L OF THE 1933 SECURITIES ACT

37. Plaintiffs incorporate the foregoing allegations by reference as if fully set forth herein.

38. Defendants offered to sell securities to Plaintiffs on numerous occasions by using various means of interstate commerce, including by mail, email, and telephone.

39. During final stages of execution of the sale of Defendants' securities to Plaintiff CNB Bancshares, Defendants' statements to Plaintiffs that they would sell the securities to Plaintiffs were untrue and constitute a material fact.

40. Additionally, Defendants omitted the material fact that there was another purchaser involved and another LOI in the works with the other potential purchaser.

41. Plaintiffs were not aware that Defendants' statements were untrue or of Defendants' omissions until December 18, 2020.

42. As a result of Defendants' actions, Plaintiffs suffered harm.

### COUNT II:
### VIOLATION OF TENN. CODE ANN. § 48-1-121 OF THE TENNESSEE SECURITIES ACT OF 1980

43. Plaintiffs incorporate the foregoing allegations by reference as if fully set forth herein.

44. During final stages of execution of the sale of Defendants' securities to Plaintiff CNB Bancshares, Defendants' statements to Plaintiffs that they would sell the securities to Plaintiffs were untrue and constitute a material fact.

45. Additionally, Defendant omitted the material fact that there was another purchaser involved and another LOI in the works with the other potential purchaser.

46.     Defendants also engaged in a fraudulent and deceitful acts, practices, and course of business against Plaintiffs regarding their intent to sell their securities.

47.     As a result of Defendants' actions, Plaintiffs suffered harm.

**COUNT III:**
**BREACH OF CONTRACT**

48.     Plaintiffs incorporate the foregoing allegations by reference as if fully set forth herein.

49.     In March 2020, Plaintiffs and Defendants entered into a valid LOI Agreement, containing an Exclusivity Provision.

50.     The Exclusivity Provision was in effect as of November 30, 2020.

51.     Upon information and belief, Defendants had discussions with another individual regarding purchasing Civis prior to November 30, 2020 and failed to notify Plaintiffs of this potential buyer, which are both violations of the LOI Exclusivity Provision.

52.     Regardless of the existence of an express contract, Defendants' course of conduct over the two-year negotiation process with Plaintiff and Defendants' actions leading up to December 18, 2020 established an implied in-fact contract.  The conduct by both parties establish mutual assent, including Defendants' request that Plaintiffs provide the signature page for the finalized Stock Purchase Agreement and Plaintiffs fulfillment of that request.

53.     Acting in bad faith, Defendants breached their agreement with Plaintiffs to execute the Stock Purchase Agreement between the parties and their agreement with Plaintiffs that they would not enter discussions with other parties regarding the purchase of Civis.

54.     As a result of Defendants' actions, Plaintiffs suffered harm.

## COUNT IV:
## FRAUD & INTENTIONAL MISREPRESENTATION

55.     Plaintiffs incorporate the foregoing allegations by reference as if fully set forth herein.

56.     Defendants made material misrepresentations to Plaintiffs up until December 18, 2020, the same day Plaintiffs were informed that Defendants would not be following through with their Agreement to sell 100% of the Civis stock to Plaintiff CNB Bancshares.

57.     Upon information and belief, prior to November 30, 2020, Defendants began discussions with another potential buyer and failed to disclose this to Plaintiffs or indicate any hesitation with going through with the Stock Purchase Agreement.

58.     In fact, Defendants continued discussions and worked with Plaintiffs, almost daily, to finalize the Stock Purchase Agreement between the parties.

59.     These continued representations, either express or implied, that Defendant was going to execute and perform the Stock Purchase Agreement were false when made, and Defendants were aware that the statements were false.

60.     Plaintiffs reasonably relied on these representations by Defendants and as a result, were harmed.

## COUNT V:
## UNJUST ENRICHMENT (IN THE ALTERNATIVE TO BREACH OF CONTRACT)

61.     Plaintiffs incorporate the foregoing allegations by reference as if fully set forth herein.

62.     Plaintiffs conferred numerous benefits upon Defendants during the period of negotiations for the sale of Civis to Plaintiffs.

63.     Plaintiffs engaged in loan participations, totaling nearly $500,000, to keep Civis afloat and to enable Defendants to maintain customer relationships during the negotiations for Plaintiff to purchase Civis.  Defendants relied on Plaintiffs' loan participations because the loans were above Civis' legal lending limit due to its deteriorated capital levels.

64.     At the request of Civis, Plaintiffs also agreed to hire the CFO at Civis following the acquisition, regardless of the outcome of the negotiations for Plaintiffs to purchase Civis, allowing Civis to keep the CFO from leaving the bank for other employment offers during the two-year negotiation period.

65.     Due to Defendants' failure to follow through with their end of the bargain, it would be inequitable for Defendants to retain the benefit of the value provided by Plaintiffs.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court issue the following judgment against the Defendants:

1.     Payment of damages listed under Paragraph 3 of the LOI as a result of the breach of the Exclusivity Provision in the LOI;

2.     Compensatory damages equal to the amount invested by Plaintiffs regarding the acquisition discussions between Plaintiffs and Defendants, including interest on all sums invested at the legal rate;

3.     Costs and attorneys' fees for bringing this action;

4.     Direct, consequential, and incidental damages for breach of contract;

5.     Lost profits;

6.     Exemplary damages; and

7.     Such additional relief as may be deemed appropriate by the Court.

Respectfully submitted,


  /s/ Mandy Stricland Floyd
 Samuel L. Jackson (21541)
 Mandy Strickland Floyd (31123)
 Bone McAllester Norton PLLC
 511 Union Street, Suite 1600
 Nashville, Tennessee 37219
 Telephone: (615) 238-6395
 Facsimile: (615) 687-6998
 sjackson@bonelaw.com
 mfloyd@bonelaw.com

 *Attorneys for Plaintiffs*